Good morning, Judges, and may it please the Court. Counsel. These judgments must be reversed because there was no evidence of economic dependence necessary to create the community of interest required by the Missouri Franchise Act. So there was no franchise here, and without a franchise, Major Brands has no viable claims. This entire house of cards collapses, and these judgments must all be reversed. To affirm these judgments, this Court must overrule its own precedent interpreting the Missouri Franchise Act in the Shelton Brothers case and disregard Bacardi v. Major Brands, where Missouri law was applied to virtually the same facts we have here. As this Court instructed in Shelton Brothers, a community of interest exists when the alleged franchisee's revenues are largely derived from the relationship or when the alleged franchise's investments and assets are substantially franchise-specific and are not transferable, leaving it economically dependent on and vulnerable to the alleged franchisor. The Missouri Franchise Act was meant to protect a smaller, vulnerable business that is economically dependent on a larger business. That is not the case here, Judges. Major Brands was not economically dependent on nor vulnerable to Mast-Jagermeister, and they did not even pretend that they were because the revenue and investments here were minimal. For the decade preceding termination, 97% of Major Brands' annual sales revenue was from other products, and 96% If we don't accept your jury instruction argument on Instructions 13 and 14, how can we set aside the verdict based on this argument on an issue the jury wasn't asked to consider? Well, I'm directing the Court's attention to the motion for directed verdict. I don't believe this case should ever have gone to the jury because there was no evidence of economic dependence or vulnerability as required. Other issues certainly would have gone to the jury. I don't believe any of those issues as well, Judge. Tortious interference and unjust enrichment. They weren't dependent on the Franchise Act. I'm sorry, Judge. The other claims that are on appeal, tortious interference, unjust enrichment. Those weren't dependent on the Franchise Act. Well, let me discuss that with you for a moment, Judge, and see if – Well, I'm just worried about whether – if the instruction was wrong, and we'll have – and I have serious doubts about the instruction. But taking that, then where are we? Well, Judge – You're supposed to decide it's not a franchise as a matter of law? That is the point, Judge, because if there was no economic dependence nor vulnerability, there was no community of interest as required by the Missouri Franchise Act. Well, I wouldn't have granted the motion for directed verdict because I wouldn't have known what the evidence might be on dependence. Well – So I'm not going to – I'm not going to reverse because – because directed verdict or – Jay, I don't want to grant it then. Well, Judge – Assuming that, where are we? Well, let me just suggest this to you, Your Honor. If at the conclusion of plaintiff's evidence in this case, they produce no evidence of economic dependence or vulnerability, and as a matter of fact didn't even claim such, it's our position that there could be no community of interest as required by the Missouri Franchise Act. Well, I know, but when – the question is when is that issue ripe for legal determination, and by whom? Well, I think it's ripe for legal determination at the – I think the case clearly goes to the jury. For example, on unjust enrichment, I don't – you invite us to say that no unjust enrichment is a matter of law. I think that's a heroic argument to say the least, and that's what you're doing with the Franchise Act. I don't think – I think you're asking us to go outside our job description. Well, I respectfully disagree, Your Honor, because I believe that at the conclusion of plaintiff's evidence, if they have not presented any evidence to support economic dependence – Okay, that's J.M. out of the close of all the evidence. Yes. That's really what you're – that's what this argument is addressing. Yes, it is. Didn't the instruction track the description of the Cooper case in the Shelton brothers' decision? No. Well, no, it did not. I thought your position was it tracked Cooper but not Freiberg. It did not quote Freiberg at all, and it misquoted Cooper. Cooper requires – one of the indications in the Cooper case was that the investments and assets must be substantially franchise-specific. The instruction in this case says the investments – it says, in effect, the investments in Jaegermeister were substantially specific to Jaegermeister. That's redundant and ridiculous, Your Honor. I mean, that's just saying when I go to buy clothing for me, I buy clothing for me. So to say the investments in Jaegermeister were specific to Jaegermeister, that's obvious, clear, and redundant. The case says the investments and assets as a whole are substantially related to the franchise relationship. So they misquoted Cooper and did not even include economic dependence or vulnerability in Freiberg. Well, did you object on that first ground, or did you just object on the ground that substantial economic dependence is required? There were objections on the first ground as well, Your Honor. On the issue of economic dependence, I understand that Cooper and Shelton Brothers talked about that sort of as the theory behind the Franchise Act. But when Cooper kind of delineated exactly what needed to be proven for community of interest, that term is not used. So help me understand. I understand what you're sort of saying is a big picture. There's no economic dependence here. Are you then saying that should have been in the instructions, or are you just saying once this instruction was given, then at – I'm a little bit confused on how we're supposed to incorporate your economic dependence argument into a jury verdict? Are we referring now to the instruction, Judge? Well, I guess that's what I'm asking you. Are you complaining that there wasn't anything about the requirement that you're asserting is there for economic dependence in the jury instructions? Yes, that's part of the complaint, Your Honor. Did you request that specific language in a jury instruction? Yes. That they had to be economically dependent upon. But it is some instruction or some wording within that instruction that addressed the issue of economic dependence or vulnerability. So you're saying in addition to, we'll say, the Cooper requirements, the two Cooper requirements, you think that there should have been a third requirement that district court gave, which is, and jury, you must find that there is an economic dependence such that major brands is financially vulnerable without this agreement. Well, to be clear, Your Honor, there were two issues with regard to that instruction. First of all, it misquoted the Cooper requirements. If I can interject. Yes, Judge. Cooper was the second of the comparative cases in Shelton. Yes. The dominant one was Neptune. And the quote from Neptune included economic dependence. Seems to me that should be your first response. If the district court read Shelton as requiring only the language in Cooper because Neptune didn't matter, that's a dreadful misreading of Shelton. Yes. And that argument was made to the district court, Your Honor. And the court rejected that argument. Okay. And felt that Cooper even misstated was incorrect. So if I may, Your Honor, let me explain, Your Honors, let me explain why it's our position that the failure to establish that there was a franchise here is fatal to the other claims. So, for instance, regarding the tortuous interference claim, if there was not a franchise relationship, there is no reasonable business expectancy in a continued relationship. Any expectancy of an at-will oral agreement, any expectancy that that at-will oral agreement would continue into perpetuity is not objectively reasonable. So without a franchise, how do you have tortuous interference without a reasonable expectancy in a continued relationship? Did the instruction actually identify the business expectancy as a franchise? Did it not? Yes. So, in a way, that instruction was to your favor, was it not? In other words, both counts, if you looked literally at the instructions, the jury could say, well, if there's no franchise, there's no interference. It could not be in our favor, Judge, because when the court erroneously instructed the jury about what a franchise was. Okay, yeah, putting aside that, but sort of if you're talking about a different type of business expectancy, and I guess as I read the instructions, the jury was only given franchise as the type of business expectancy that was before them, and maybe I'm reading it wrong. Yes, yes, yes. So that is the point, Your Honor, that if there was no franchise, and particularly where the jury was erroneously instructed as to what a franchise was, then there are tortuous interference claims as well, because all you're left with is an at-will oral agreement, which could not reasonably be expected to continue into perpetuity. I mean, suppliers sometimes change distributors, particularly after years of poor performance, and the evidence here was unrebutted on that point. So it's no surprise that Mass Jägermeister decided to work with a different distributor. And I think, Judge Loken, you also mentioned the conspiracy claim. Well, no, you're doing the easy ones. Okay. So I should leave that alone. The one that I don't see us being able to decide as a matter of law is unjust enrichment. Let's talk about that then, Judge. If you have an oral at-will agreement that has no expectancy, reasonable business expectancy to continue into perpetuity, major brands got exactly what it bargained for. They took a risk by investing and always profited from selling Mass Jägermeister. But there's all that stuff at the end about extra money. Yeah, yeah. But they even sold, if you look at the evidence in the case unrefuted, they sold their extra inventory and did not lose any money on it. They were compensated for their expenses by profits they made in Jägermeister sales. Okay. But how do we decide that as a matter of law? If the evidence is unrefuted, Your Honor, there's no other way you could decide. Unrefuted? How? I mean, it's all refuted. It's all refuted in the was this a franchise fact question? Well, if it was less of an investment to then is required, for economic dependence, but it otherwise fits the definition of unjust enrichment for one reason or another, they're separate claims. Oh, yes. I don't even know if they're both jury issues, but I guess they are. And I agree with that, Your Honor. But if the evidence was insufficient as a matter of law to prove that there was a loss, then why are we the right ones to decide that first when the district court has already ruled against you on that? Well, because the court must look at what the evidence was. And if there was no evidence of a loss, We're not jurors and we're not district judges. Understood, Your Honor. We almost always let unresolved issues go first to the district judge. Yes. Why is this appropriate? Why is this an exception to the general rule? Because in this case, Your Honor, it's Because you think the evidence is so overwhelming. Well, no, Judge. The argument that I'm making to you is founded on the point that there was no franchise. And so That doesn't matter. That's my whole point. No franchise does not mean no case. Okay. All right. If that's your argument, I can deal with that. Well, that's not my only point, Your Honor. The fact that there was no franchise, then, you know, the point there being that major brands bargained for an oil at-will agreement by which they made profit, they made investments and profited from it. I don't think you've researched the full array of unfair unjust enrichment cases that I've been forced to look at over the years. They come in all shapes and sizes, and the unjust enrichment occurs in the midst of all kinds of contractual and non-contractual relations. Yes. Yes. But, Your Honor, there has to be some evidence by which Mass Jägermeister was enriched. And no out-of-pocket is enough. I mean, loss. Exactly. And so my point is that major brands presented no evidence of a loss. It's not a matter of substantial evidence or the judge weighing evidence on that issue. It's a matter of fact that they did not present evidence of a loss. Well, the argument, as I understand, part of the argument. Yes. And the other side does argue, well, it's a franchise, therefore, that this claim is good. But that's my hypothetical. That's gone. They also argue that your client asked major brands to purchase large amounts of inventory and then hold back sales when it had already reached a deal with SGWS. And your basic answer is no franchise equals no claim. I mean, that's not enough. That can be enough, it seems to me, to create a disputed issue of fact. Only if they were not able to sell but that material, that extra inventory, at a profit. If the evidence shows that, how is there unjust enrichment? What if it's delayed? Is there any evidence that delayed costs? I wasn't at the trial. I understand. I haven't read the trial record. Okay. Understood, Judge. But my response to that has to be that there had to be some evidence of a loss. And if there is no evidence of a loss, no matter what else may have happened in the interim, there can be no unjust enrichment. Well, I think I've seen cases where, in fact, I think as a law clerk many years ago, I saw a case where the issue was, the argument was, if there's no loss to the plaintiff, there can't be unjust enrichment to the defendant. And the Second Circuit held to the contrary. I haven't seen that case, Judge. Well, no, it's before your time. But you don't forget those sorts of things, because it was an argument that struck me at the time. Understood, Judge. So I would conclude by saying that, as my original argument began, Your Honor, that the Court should reverse these judgments against Mass. Jägermeister, Southern Glazers, and Southern Glazers of Missouri, and direct the District Court to enter judgments for appellants and cross appellees, because there was no franchise here. There was no community of interest, no breach, no tortious interference, no unjust enrichment, and no conspiracy. And if the Court has no further questions. What did the jury find, remind me, on unjust enrichment? The jury, well, there was an option of claims to proceed with, and because the plaintiff had to make a choice on which to proceed with, they proceeded with the Franchise Act claim. But if the Court here agrees that there was no violation of Missouri Franchise Law, they may have an option to proceed on unjust enrichment, and I'm addressing that. So you're saying the election was made before the case was submitted to the jury? Yes, Your Honor. All right, I understand. Thank you, Judges. Mr. Walsh. Good morning. May it please the Court, Defendant's Counsel. I think it's very clear, Your Honors, after this morning and for all the briefing, what the defendants want to do is simply ignore what happened at the trial court. They want to ignore the findings of a jury that there was, in fact, a franchise. We went through all the processes, and most particularly what they want to do is rewrite and have you declare a new law that's different from Shelton, one that includes standards and objectives that no party could meet, because that's how they would get out of the judgment. Now, my first question for you is who can overrule Shelton? Well, it's an interesting question. Because you argue constantly that it was wrong, namely that it misconstrued Missouri law. Well, I think it — Now, who can decide that? Well, I think, Your Honor, you're in a very difficult position with this, because — That's a yes or no. It's an easy yes or no. Who can overrule it? Yeah. Well, I don't think you — to win this case, I don't think you can — have to overrule it. Well, that's — To rule that — No, I want to start there. Because I think you don't understand it. Right. Well, I understand the law. There are only two courts that can overrule Shelton. Yeah. For our panel. Right. The en banc panel or the Supreme Court. No, the Supreme Court of Missouri. Right. Well, the U.S. Supreme Court, of course, but this State law is rarely cert-worthy. Right. And I think that — I understand that, Your Honor. But the position is, you are in this difficult position where you're bound by the rule of the circuit, which is what you're discussing, but you also are bound by the Constitution to follow the rule of the Supreme Court of Missouri. Oh, no, no. And if you — Come on. No. See, that's a false cloak. Well, Your Honor, I think Article VI, paragraph 2 of the Constitution would have you do that. And I don't think — I don't think — I don't think that the en banc panel is not to be found in the Constitution. Well, the Supremacy Clause says that this circuit can only follow the law of the — Shelton obeyed the Supremacy Clause in Erie. Yeah. No, I get that, Your Honor. Now you don't like the way it ruled. And you think the Supreme Court of Missouri would rule otherwise, but you're not there. So you've got an argument there for the en banc court. Well, what I believe, Your Honor, is that the Supreme Court of Missouri in both High Life and McHenry did rule otherwise. And the misinterpretation — You see, Shelton took the second half of the problem. The first half of the problem was what does the 75 Amendment mean? And Shelton — that was squarely presented in Shelton and decided. The second part of the problem is, okay, if the 75 Amendment is to fit in, does it also — do we also have to apply the first half, which includes economic dependence? And Shelton said yes. And the Missouri Supreme Court hadn't decided that. And you — I think you know it hadn't decided it. But I was there and I know what the panel and Shelton thought it was doing. And that's neither here nor there. But that's what the opinion says. I understand that, Your Honor. But I think that the facts of High Life, for example, are that there was an affirming — I don't care about the facts. I care about the issues that were decided by the Supreme Court of Missouri. And that question wasn't addressed. Well, whether or not someone that had less than 2 percent of the business being a franchise was decided. The — whether or not a party that did nothing to add expenses or to advertise or to market for them was decided in High Life. Okay. And a franchise. Well, I thought your position was that even under Shelton Brothers, you think the instruction was correct and that the evidence was sufficient. Absolutely, Your Honor. Why don't you talk about that then instead of overruling a panel, prior panel? Absolutely. The decision in Shelton, the judge followed what the decision in Shelton was. It followed the Cooper standard. The Freeboard case has two different standards. It can either have a high amount of sales or it can have brand-specific investments. And that's what it did. It was an or. Their briefing and their statements tried to make it — make Freeboard an and. But the judge rejected that, and he specifically said it in their motion to — for a new trial. They're trying to make it an and when it's not. It's an or. And it presented it to the jury in a fair and, you know, manner to have them find that there is a community of interest. And what the defendants are trying to do is have this Court rewrite Shelton. Rewrite it so that it has much more restrictions on it, not just a community of interest means brand-specific investments that were required by the agreement, which they were. And we went through those. The facts were replete with it, Your Honor. They — and the judge in the trial court specifically recognized all those, that we had to make specific brands' investments. We had $4.50 per case that had to go in a local marketing fund that was spent for — some of it was literally wrapping our trucks with their advertisements to go out there and sell our products. The penultimate sentence in the Shelton opinion says, Moldov cannot reasonably be deemed economically dependent on Shelton or to have unequal bargaining power in the relationship. That's about as close to a holding as you can get. I understand that, Your Honor. It also thought that it was 98 percent of the business highlight. But for Shelton, for that economically dependent issue, the question is, what does economically dependent mean? Does it mean — what they're really saying is financially dependent. We don't know because you didn't — the district court didn't allow that question to be — to come up. But what this is, is it followed the Cooper and the Freeberg test. It followed and put that in there. It doesn't follow Neptune and it doesn't follow Shelton. Neptune is a New Jersey State courts appellate case. Cooper is Wisconsin, you know, which I know I like Wisconsin better than New Jersey, but it's irrelevant. I think Cooper was New Jersey that was coding, but I could be wrong, Your Honor. But the point is, Your Honor, when it looks at those — Well, okay. It's an internal quotation. Cooper is a Third Circuit case, but our court said that the Third Circuit distilled Neptune and its progeny into the two points from Cooper. Mm-hmm. So your position is that the court decided that that distillation was the best estimate of Missouri law? Exactly, Your Honor. And that's what we followed. And is it what you're saying, that that also subsumes the economic dependence? Because I'm still trying to figure out where — was that discussed at the district court? Like that should be an overarching finding that the jury needs to make based on these factors, and the district court said no? Or was the — was it just simply that the parties agreed that that was — or at least you agreed that economic dependence was subsumed within the Cooper 1-2 test? Well, we believe it was clearly subsumed within the 1-2 test. Our opponents did want the court to add something, but it wasn't just economic dependence. If you look at what the — their proposed instruction, it was for having a large proportion of revenues such that they were economically dependent. This is in the appendix at 588. That's their proposed instruction. And the problem with that, Your Honor, is that you then have to define that again, because that goes against the Freebird test, because all of these — all of their instructions were and, and, and. It wasn't an or. You couldn't have — because Freebird clearly says you can have brand-specific investments or have a large percentage of your, of your business be it. And, and, and Freiburg doesn't have economic dependence in that, in that, in that test, correct? Right. Or at least those, those words. Right. And so the idea would be what they — the idea is you'd have to have this — I guess what they're asking for is to, is to make a new test, not a Shelton test, not with what was clearly articulated as a distillation of Cooper and Freebird and that came to an adjustment on, on Shelton, and then have you rule as a matter of law that that new test that wasn't applied is something that can't be met. And, of course, it couldn't be met by anyone. But the, the, the idea is that they want to have this definition of community interest, that the legislature of the community of interest that the Missouri legislature did is something that is, you know, a, a riddle wrapped in a mystery inside an enigma. Because you have to go from community of interest to, you know, some percentage of sales and then to economic dependence. And then what does economic — You have to understand franchise acts, why they came about and what their purpose is. And your client looks, couldn't look less like a McDonald's franchisee to me than the corner grocery store. I'm telling you, this is not that type of franchise, Your Honor. This is not that type of franchise statute. There are other statutes that have to protect McDonald's franchises, Your Honor. And, in fact, in the, in New Jersey, for example — The 75th Amendment is what you're talking about. It was tucked into the Franchise Act. As a general statement, but, Your Honor, that doesn't cover just the McDonald's, okay? Because that, that statute, it simply says that if you terminate, you have to give someone 90 days' notice. That's it. There is no extra, extra associated penalty about it or the requirements like you have in liquor, because 407.413 brings in just for liquor that you have to terminate with good cause and in good faith. And that's what they didn't do. It doesn't — the franchises with McDonald's and all those things are covered by federal franchise law, but by other franchise laws. They're not just able to terminate them in 90 days, not because of the State of Missouri, that statute, but look at the other statutes that look at them. Even, you know, the New Jersey franchise, what they're looking at, both Neptune and Cooper, et cetera, they're looking at the non-liquor franchise. In non-liquor franchises in New Jersey, there's a 20 percent requirement. You have to be above 25 — 20 percent. In liquor, you don't, because they view it differently, Your Honor. And it's very different. And you specifically noted that in the Sarasota case. You went through why the 21st Amendment sets up the fact that states can do things differently in liquor than they do in everything else, because they're concerned with the pernicious effects of alcohol, underage drinking, overconsumption, et cetera. And one of the things that you stated in that case was that they're particularly concerned with the three-tier model is designed to have no one have a financial interest in the other. This is not a three-tier model case. It's strictly State law. The 21st Amendment, I don't think, is mentioned in the briefs, is it? It is, Your Honor. We mention it many times. The defendants never mention it. And the reason is, Your Honor, if the concept is that to have this, these people have to have some — they'll call it economic dependence, but what they're really talking about is financial. You have to go out of business. What you're saying is it would be inconsistent with the three-tier model to require dependence between the two tiers? Yes, Your Honor. Well, first of all, it depends on how you define it, okay? Because clearly there's no more businesses that are economically dependent upon each other than the alcohol distribution in the State of Missouri. Suppliers cannot sell to retailers. Suppliers can only sell to wholesalers. Wholesalers can only sell to retailers. And so they are absolutely economically dependent upon each other. But that's not what they want. What they want is something that is really financial dependence, that you have to go out of business. And that's not the test, Your Honor. Clearly, in the alcohol industry, these different branches of the three-tier system are State-prescribed to be dependent upon one another. That's how they have to do it. And so there's lots of other elements of that as well. But they are absolutely economically dependent upon each other. But they're not supposed to be to a standpoint that one can just control the other because they're trying to stop, as Judge Loken pointed out in the Sarasota case, the old Tide House matters, where the suppliers could force these people to buy things,  and you don't have to go any further than what they did here. They said to us, buy all this inventory and then don't sell it, which we did to honor what they prescribed and told us to do, so they can boost up sales the next year. And then on top of that, the testimony that was in front of the judge and in front of the jury is that the CEO of Jägermeister said that his model person to sell it to is anyone that has a pulse and enjoys a good time. That's it. And their website said that they're in favor of selling it to anyone over the age of 18 in the United States when no state allows someone to sell. The states set these up so that distributors can't distribute those things legally to people under the age of 21 in the state of Missouri so that they are not out there selling it just to anyone. We have to check on every search. So I think absolutely the reason this was set up was because of that three-tier system. And that's why I believe that liquor-specific only has to apply. But in this matter, it doesn't. It's a great academic question, I think. But for this matter, it doesn't because we met the standard in Shelton Brothers. We met it clearly. We presented it to the jury. The jury looked at it, and they determined that we met it. And the facts of it were there. We weren't just sufficient as the standard of review requires. What the trial court judge described in his motion denying the motion for due trial as substantial, substantial evidence. I mean, that's a lot different than just what's required here, which is sufficient evidence. So that's why we believe it. Is it a fair summary of your position that any liquor store in St. Louis that spends more than 2 percent of its budget on Budweiser signs becomes an embedded franchisee? No. Because a liquor store is not defined in this statute as a warehouse distributor. A retailer. A retailer is not defined in this statute. It wouldn't be covered by it. But that's what your claim is here. Well, Your Honor, it's the three-tier system, supplier, wholesaler, retailer. Your people are not retailers. Exactly. We are a wholesaler. We are someone who distributes it to – we distribute this product to – Then why does that argument not apply to retailers? Because the statute applies to wholesalers. It doesn't apply to retailers. Because retailers aren't supposed to be doing that same type of thing. We are the ones that enter into it. That would also be, I believe, Your Honor, in violation of the three-tier system set up in Missouri. This applies simply to wholesalers. For in the liquor context, in the liquor context, you know, I don't – I can't say whether or not it applies to, you know, retailers. If you open up a store and you say all I'm selling is Budweiser, I don't know whether or not they become that. It depends on what their agreement is. But I know here, we had a five-decade, almost 50-year relationship. When they started selling, asked us to sell this, there were zero sales of Jägermeister in the state of Missouri. Zero. We increased that over those five decades to almost 6,000 different locations. 6,000. And there were, you know, 90,000 cases, over a million bottles in one year. That's all in the – that's Plaintiff's Exhibit 117. It's in the appendix at 2493. All of that happened. All of that happened over that time. And as the judge put in his order denying the motion for a new trial afterwards, he said that in the community of interest, he said a huge role in marketing and promoting Jägermeister in Missouri. Specific investments in the local marketing fund, that's $4.50 for every case to promote it in Missouri. How is that promoted? All different sorts of things. Tastings, where you take people out and have them taste this. You know, tent cards, promotions at parades and events like Mardi Gras that just happened, and Oktoberfest and those types of things, et cetera. Educating people, educating the people in bars and restaurants as to what this product is. And that doesn't – that never comes back. And on top of all that, we also paid, back to Jägermeister, $2 for every case for national advertising. For advertising all over the country, even though we are prohibited from selling in any state other than the state of Missouri. Those are the type of things, those are investments that were made for them that can't be – In addition to that, we hired a person and all they did was support Jägermeister. They called themselves the Jägermeister person. They walked around with a business card that had both brands on it, et cetera. That's what we did for those people over all those years. Under an at-will contract. I'm sorry? Under an at-will contract. I don't believe it was an at-will contract, because I think it's covered by a franchise law. It was an agreement, both – the people from both of their sides. Was there any documentary evidence of either side having that understanding? Understanding of what, Your Honor? Expressing it, major brands expressing to Jägermeister or vice versa, that, you know, here's – consistent with our franchise agreement, here's what we're doing for you. Well, there was, you know, 45-plus years of business together, Your Honor. I don't think there was a statement that says consistent with our franchise – Did anyone ever use the word – Well, there was right before termination. We specifically told them and recognized about it, Your Honor. And I see my time is up, Your Honor. The only thing I wanted to point out, which I think that you understand or pointed out, was that this idea there being an unjust enrichment. Unjust enrichment is measured by the benefit that was conferred to the other party, the defendant, not whether or not the plaintiff has made some profit on it. It's the benefit that was conferred. And here, all the things that I just listed, from zero sales to a million bottles at 6,000 different locations, that's the unjust enrichment that they were willing to pay. $25 million to $10 million, then $15 million, $25 million. Nothing that came back in that. That's what was that unjust enrichment. Were you seeking the same amount for unjust enrichment as you were under the franchise claim? We were, Your Honor. And that's why the jury instructions – the only reason why I believe the jury didn't fine for us is because the jury instructions specifically said if you fine for us in the franchise under the, you know, first part of this, you cannot fine for us for this. So it was submitted to the jury, but the jury had to elect? That's right, Your Honor. Right. It specifically said if you fine for us in the franchise, you can't fine for that. Because you can't have a double recovery. Exactly, Your Honor. Exactly. All right. Thank you. A rebuttal? Oh, there we are. So my apologies, Judge Carlton. I did make a mistake there. It was submitted to the jury. Yeah, I understand now. Yeah. And the jury did fine that there was no unjust enrichment? No, they elected. They elected. They were told they had to fine us. And they did fine that if they found in favor of the plaintiff? Yes. So it's not as though they found stand-alone no unjust enrichment? That is correct, Your Honor. All right. So let me just address also a couple of other things here. Major Brands is arguing that there should be some special carve-out for the liquor industry. For number one, the Missouri Franchise Act makes reference to persons. So there is no exclusion or special carve-out for liquor distributors or retailers. Also, I will point out that your question and kind of follow up with that, Judge Kelly, the jury was not properly instructed on the Cooper case because in that, the requirements there were that, number one, the distributors' investments must have been substantially franchise-specific. By that, they mean the investments as a whole substantially franchise-specific. To say that – When you say investments as a whole, you mean as a business, the investments that the business makes just generally? Yes. Yes. Because if you interpret that to say the distributors' investments in the franchise must have been substantially franchise-specific, that's redundant. Obviously, the investments in the franchise are going to be franchise-specific. If the district court had given the instruction as you have corrected it in your mind, what we're calling the Cooper instruction, would that have been – would you be appealing that? If they had – if the instruction had been the distributors' investments must have been substantially franchise-specific, we would not have appealed that point. But it is still important in what Shelton, as the final sentence in that decision states, there must have been evidence of economic dependence or vulnerability. And here, we know – Can I just follow up before you? Yes, ma'am. And so you're saying that should have been in the instructions, the words economic dependence? And I apologize if I'm asking again. That's okay. But I just want to make sure I understand your position about economic dependence and whether that is an argument to the jury and sort of some legal standard or whether it's something that the jury is instructed on along with what we've been calling the Cooper standard. Yes. Yes to the latter, that it should be instructed? Yes, Judge. Did you propose that? So you added the economic dependence in your proposed instruction, correct? I believe so. And did you propose a definition of that? A definition of economic dependence? I don't believe so. Thank you. So where in the record will we find your objections to the court's instructions? I'll have to send that to you, Judge. I don't have that right before me now. Was there an instructions conference? Yes, there was, Judge. You just don't know where, what volume and so forth? I've read it and I've looked at it. Okay, we'll find it. We'll find it again. Thank you. Okay. So but here, Judge, there could be no community of interest, no economic dependence, when Jägermeister sales constituted just 2% of major branch revenue and only 1% of their investments were in Jägermeister sales. So there could be, and as the court decided in Shelton Brothers and in Bacardi, as a matter of law, there could be no franchise. Thank you, Judges. Very good. Thank you, Counsel. It's a complex case and it's been well-briefed and argued. We'll take it under advisement.